UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
UNITED STATES OF AMERICA,          : 25-cr-00314-RER-12
                                   :
                                   :
    - versus -                     : U.S. Courthouse
                                   : Brooklyn, New York
THOMAS GELARDO,                    :
                                   : October 29, 2025
                Defendant          : 12:13 p.m.
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR DETENTION HEARING
BEFORE THE HONORABLE TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE

**A    P    P    E    A    R    A    N    C    E    S:**


**For the Government:**         **Joseph Nocella, Esq.**
                                Interim United States Attorney

                          BY:   **Irisa Chen, Esq.**
                                **Sean M. Sherman, Esq.**
                                Assistant U.S. Attorneys
                                271 Cadman Plaza East
                                Brooklyn, New York 11201



**For the Defendant:**          **Bruno V. Gioffre, Jr., Esq.**
                                500 Mamaroneck Avenue, Ste. 320
                                Harrison, NY 10528



**Transcription Service:**      **Transcriptions Plus II, Inc.**
                                61 Beatrice Avenue
                                West Islip, New York 11795
                                RL.Transcriptions2@gmail.com



Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

                                    Proceedings

1              THE CLERK:  This is a Criminal Cause for a Bail

2    Application, *USA v. Thomas Gelardo*, case number 25-cr-

3    314.

4              Appearing for the government?

5              MS. CHEN:  Good afternoon, your Honor.  Irisa

6    Chen and Sean Sherman for the government.

7              THE CLERK:  Thank you.  And appearing for Mr.

8    Gelardo?

9              MR. GIOFFRE:  Yes.  Bruno Gioffre,

10   G-I-O-F-F-R-E, for Mr. Gelardo.

11             THE CLERK:  Thank you.

12             MR. GIOFFRE:  Good afternoon, your Honor.

13             THE COURT:  Good afternoon.  So it's my

14   understanding that we're here today for a detention

15   hearing, Mr. Gioffre.  Obviously, I saw you guys last

16   week and here we are a week later.  And as you know, the

17   government did seek detention in the detention memorandum

18   that was filed last week.

19             Ms. Chen, who's arguing the detention hearing

20   today?  You?

21             MS. CHEN:  I will be, your Honor.

22             THE COURT:  Okay.  So is there anything you

23   would like to add in terms of your written submission

24   from last week?

25             MS. CHEN:  Yes, your Honor.  First of all, just

3

Proceedings

1    for the record, the government's moving for a detention

2    hearing under 3142(1)(A) because the defendant's charged

3    with a crime of violence here, namely Count 5.

4              We're also moving under 3142(e) as the crime

5    charged, again Count 5, involves a dangerous weapon.

6              As well as 3142(f)(2) because the defendant

7    poses a serious flight risk, as well as a risk that he

8    will intimidate or threaten or attempt to do so for

9    prospective witnesses.

10             Your Honor, to begin, this is a presumption

11   case under 3142(e)(2)(A) given Count 5 that the defendant

12   is charged with Hobbs Act extortion conspiracy.

13             As stated on page 8 of the detention memo, as

14   well as additional cases, *Dillard*, a Second Circuit case,

15   and *Agnello*, an eastern district case by Judge Gershon.

16   Hobbs Act extortion conspiracy remains a crime of

17   violence under the Bail Reform Act.

18             THE COURT:  Please pause, Ms. Chen.  I'm sorry

19   to interrupt.

20             MS. CHEN:  Sure.

21             THE COURT:  You made reference to page 8.  I

22   was looking at the detention memorandum from last week.

23   Is there a new one?

24             MS. CHEN:  Sorry, 18, your Honor.

25             THE COURT:  Okay.

4

Proceedings

1          MS. CHEN:  18.

2          THE COURT:  Thank you.  Thank you.  Go ahead.

3          MS. CHEN:  No problem.  So first of all, your

4    Honor, it's the government's position that the defendant

5    cannot rebut the presumption, but certainly even so, the

6    government can prove by a preponderance that the

7    defendant poses a flight risk as well as clear and

8    convincing evidence that he poses dangerousness to the

9    community.

10          So first I want to address flight risk.  As

11    discussed briefly in the detention memo and then at

12    length kind of in the narrative portion, the evidence in

13    this case is extremely strong.  There are surveillance

14    photos and text messages between the defendant and co-

15    conspirators discussing the defendant's collection of

16    money from gambling victims in this case.

17          There are also very serious consequences.  The

18    government's initial preliminary guidelines estimate puts

19    the defendant at 168 to 210 months without acceptance

20    points.

21          In addition, your Honor, the defendant has

22    significant assets despite having no employment or no

23    legitimate employment as reported in the Pretrial

24    Services report.

25          For example, your Honor, the day of the

5

Proceedings

1  defendant's arrest, a $400,000 valued car was seized, a

2  $500,000 approximately bank account was seized.  At the

3  defendant's apartment, $220,000 in cash was seized.  In

4  addition, $1,600 was seized at the premises from the

5  defendant's wallet in cash.

6          In addition, as I believe your Honor has the

7  photos that were passed out from the premises search

8  warrants, there were numerous pieces of jewelry and

9  luxury watches, the value of which is still unknown at

10  this point but the government would estimate would be at

11  least tens of thousands of dollars in value.

12          And your Honor, I next want to address

13  dangerousness to the community.

14          First of all, the defendant here has a

15  significant criminal history including first degree

16  assault, as well as criminal possession of a weapon.

17  Importantly, as noted in the detention memo, the

18  defendant did violate probation or parole while he was

19  released on one of the charges in 2005 and he violated

20  that in 2008 demonstrating his inability to be supervised

21  and his refusal to comply with conditions.

22          Obviously, in this case, the defendant is

23  charged with acts of violence and threats.  For example,

24  in Count 5, the defendant engaged in actual violence,

25  assaulting a victim to pay back a gambling debt.  There's

6

Proceedings

1  evidence of this back in November 2022 including text

2  messages.  And obviously there would be additional

3  testimony that would corroborate that.

4           Also in October of 2023 the defendant assaulted

5  a co-defendant as again described in the detention memo.

6  He went to 80 Washington Place when there was a

7  confrontation between the two games and essentially hit a

8  co-defendant with a baton.

9           And notably, your Honor, when his premises was

10  searched on October 23rd, the work concerning amount of

11  weapons recovered including a baton that could have been

12  the baton that was used to assault his co-defendant.

13           Among other things, there was a bullet,

14  multiple bulletproof vests, a baton, a nightstick,

15  numerous knives, a machete, brass knuckles.  There were

16  also weapons that do not appear to be firearms, your

17  Honor.  I think it's an air pistol and paintball guns.

18  But as you can see from the photos that have been

19  provided to the Court, as well as to defense counsel, the

20  appearance of some of these guns I'll call them looks

21  just like that of a true handgun or firearm.

22           And your Honor, when that combined with the

23  defendant's obviously alleged extortion and collection of

24  credit here, alleged extortion and Hobbs Act conspiracy,

25  it's particularly concerning because these particular

7

Proceedings

1    weapons would be essentially used and are

2    instrumentalities of that violent crime.

3            Lastly, your Honor, I just want to highlight

4    that the defendant has significant assets including the

5    $200,000 in cash despite no reported employment.  And

6    again, this suggests that the defendant has been frankly

7    prolific in his collection of gambling debts and other

8    debts in this case and that his criminal conduct through

9    2022, 2023, and the present has been significant.

10           Your Honor, for those reasons, we're seeking

11   detention for the defendant.

12           THE COURT:  All right.  Mr. Gioffre, response?

13           MR. GIOFFRE:  Yes, your Honor.  With respect to

14   the government's position, I'm going to start with their

15   argument right now, the paintball guns and the baton,

16   first of all, those paintball guns, there's nothing

17   illegal to possess them.  There's been no allegations

18   that he's ever brandished one of those in collection of a

19   debt or anything like that.  It's perfectly legal to have

20   those paintball guns.  Some people have them even for

21   self-defense which I'm going to get into.

22           Your Honor, the government is aware, they

23   didn't tell the Court here, but the government is aware

24   that I believe in the last year that there's been several

25   attempts made on my client's safety and well being.  In

8

Proceedings

1  fact, the FBI approached my client I believe six months

2  ago which he relayed to me because I've been representing

3  him for approximately 20 years.  And it was relayed to me

4  that the FBI approached him, wanted him to speak to them

5  and warned him that his life was in danger.  So that --

6  clearly, you can understand a reason for having some of

7  these self-defense mechanisms knowing that his life is in

8  danger.

9          With respect to the allegation that he used a

10  baton against one of the other co-defendants, the

11  government doesn't have specifically what transpired.  My

12  initial investigation is that my client, that there were

13  seven or eight individuals that were attacking my client

14  and my client was acting in self-defense during this

15  encounter with some of the co-defendants here.

16          So putting that aside, now let's look at his

17  criminal history.  As I indicated before, your Honor, I

18  have represented him for quite some time.  I've

19  represented him in the 2005 -- not 2005 case, but the

20  2008 case which was a combination of a violation of

21  probation as well as possession of a weapon.  The gun

22  that he had, again, was found by probation in his home

23  which he had for his own protection.  Obviously, it was

24  illegal to do so, but he had it.  As soon as probation

25  came, they asked whose it was.  He took ownership of

9

Proceedings

1    that.  He lived in a shared house with his sister and his

2    parents at the time.  Could have easily denied.  He took

3    responsibility.  He two to four years sentence on that.

4    I representing him on that.  He never once missed a court

5    date in all the years that I've represented him.  He's

6    never warranted.  So he does have respect for the Court,

7    the Court's orders.

8           So I think you could look at that as being so

9    distant in terms of where this person is now.  Let me

10   tell you about Mr. Gelardo now.  He has a nine-year-old

11   son that he shares with women in Long Island.  He has

12   shared custody with his child, his son, Thomas Junior.

13   His son right now is very concerned because he hasn't

14   spoken to his father and he wants -- he doesn't even know

15   that his father's been arrested.  Too young to understand

16   that.  But clearly he's upset that he can't see his dad

17   right now and they have a very, very close relationship.

18          So his ties to the community are there, Judge.

19   I know the People are seeking detention, but he has

20   significant ties to the community.  He lives in a house

21   with his sister that his sister owns.  We're proposing

22   that house that she owns, she's willing to sign as a

23   confession of judgment in the government's favor.  We're

24   willing to do that with a half a million dollars.

25          We also have other ties to the community.  He

Transcriptions Plus II, Inc.

10

Proceedings

1    lives in the same complex as his mom and dad who are both

2    elderly.  His mom is very sick.  She has suffered from

3    MS.  He's very important as far as taking care of her,

4    driving her to appointments, shopping for her.  They're

5    in the same complex.

6            His FRP, the financially responsible people

7    that are willing to come forward as well, we have --

8    they're not here today because we put this on kind of

9    quickly based upon timing.  But I did speak to all of

10   them on the phone.

11           He has a cousin who's a real estate broker,

12   significant salary, lives in Yorktown.  I spoke to him.

13   He's willing to come in and sign.

14           Obviously his sister would be signing the

15   property as well as an FRP.  She's a schoolteacher, makes

16   approximately over $100,000 a year.

17           He has another cousin Craig Scialdone who is

18   head of, a supervisor at Parks and Recreation in the Town

19   of Greenburgh in Westchester County, as well as a

20   lifelong friend -- sorry if I'm going too fast, your

21   Honor.

22           THE COURT:  That's okay.

23           MR. GIOFFRE:  A lifelong friend, Ronald

24   Browning, who owns a very successful construction

25   company.

11

Proceedings

1    All these people have clean records.  They are

2    legitimate, responsible people that are more than willing

3    to come in and sign for him.  He's lived in Westchester

4    County his whole life.  There's no reason he's going to

5    flee, leave his son, leave his family, leave his family

6    with the financial burden of, you know, a bail package

7    that they would be ultimately responsible for.  He's

8    here.  They did correctly seize a significant amount of

9    money in this case and a bank account that had

10   approximately $500,000.  I'm not going to get into the

11   legitimacy of some of those funds right now but at this

12   point you're looking at someone that they basically

13   cleaned out all financial ability to flee.  So there's no

14   issue with a flight risk here.  Mr. Gelardo, like I said,

15   has been to court every single time every single time

16   he's had a case.

17       The other thing too, your Honor, I just want to

18   point out the similarly situated people in this case,

19   defendants in this case; Becher, Mazzola, Trustman,

20   Ziliani, Hoti, and Lanni, all of them received a bond

21   ranging from 25,000 up to 500,000.

22       I believe my client's bond, especially being a

23   secured bond and three FRPs would be in line with not

24   only what has already been set down in other defendants

25   similarly situated all charged with extortion, your

12

Proceedings

1   Honor, is why I say they're similarly situated, some of

2   them of a robbery, some of them on just extortion credit,

3   but all of them similarly situated and they received a

4   bond and released.

5           Now, your Honor, with respect to the incident,

6   John Doe number 5, the only thing I could say, Judge,

7   with respect to that, it's my understanding through my

8   investigation that that individual wasn't physically

9   injured.  What happened and transpired we could get into

10  in terms of down the road in this case.

11          But your Honor, based upon all those factors, I

12  believe the bail package that we've set forth and propose

13  is reasonable to secure his appearance and also to give

14  the Court confidence that there's not going to be issues

15  with, you know, based upon Pretrial's recommendation and

16  their conditions with the no contact and those sort of

17  things, your Honor.  I think your Honor can be confident

18  that my client would adhere to all of your conditions of

19  release.

20          The last thing that I would ask from a

21  logistics standpoint, your Honor, if your Honor agrees

22  with my arguments and sets the three FRPs and wants to,

23  obviously needs to interview them, I would ask based upon

24  especially my client not being able to see his son for

25  the last week, that my client be released and that we

13

Proceedings

1    fulfill all these conditions within one week.  I'm

2    confident, I've filed confession of judgments up in

3    Westchester County before on some of my prior clients,

4    I'm confident I can turn that around rather quickly and

5    get them in to see your Honor as well as being

6    interviewed by the government fairly quickly as well.

7                So a week I think would meet all the

8    conditions, and I thank your Honor.

9                THE COURT:  So Mr. Gioffre --

10               MR. GIOFFRE:  Yes.

11               THE COURT:  -- you know, as I think you may or

12   may not have been in court last week when I made the

13   observation that, you know, I don't find the government's

14   arguments regarding risk of flight to be the most

15   compelling of their arguments.  But given the defendant's

16   record here, including various additional crimes of

17   violence and the violation of his prior supervision, and

18   the unexplained assets, I'm really struggling with the

19   notion that you have overcome the presumption insofar as

20   what does Mr. Gelardo to for a living?  I mean I don't

21   know that you're in a position to offer that up under the

22   circumstances here.  But the amount of money and jewelry

23   and watches that were seized is unusual when somebody

24   does not have some sort of verifiable gainful source of

25   employment.

Proceedings

14

1          And I note that the Pretrial Services report

2    specifically identifies these unexplained assets as one

3    of the concerns in terms of the risks that this defendant

4    would be posing if he were -- as to whether or not he'll

5    come back to court.

6          But I frankly see that as a risk that he may

7    not abide by the conditions of release because if he is

8    somebody who's been making their money through crime

9    pretty much exclusively, I don't know if that's true or

10   not -- does he have any verified employment, sir?

11         MR. GIOFFRE:  I think I could address that.

12   Recent employment, no, but I could tell you that he

13   worked for a union in New York City construction for a

14   number of years, in excess -- since his release.  He was

15   there for approximately ten years.

16         More recently he has not had employment.  He

17   was honest with Pretrial that he is not working

18   presently.  But I can tell you he did work for a

19   significant amount of time in construction in addition to

20   that company as well as other construction companies.

21         THE COURT:  When is his last legitimate

22   employment that is provable?

23         MR. GIOFFRE:  When?  If I can have one moment?

24                    (Pause)

25         MR. GIOFFRE:  It was right before COVID and

15

Proceedings

1  that was part of the reason why he, you know, left that

2  job.  So going back then.  And then once COVID hit, he's

3  been working, you know, part time off the books, that

4  sort of thing, for different friends and companies and

5  things like that.

6          THE COURT:  All right.  Ms. Chen, would you

7  like to respond?

8          MS. CHEN:  On just a couple points, your Honor.

9  First, I want to address I guess the two acts of violence

10  specifically discussed.  First, in October 2023 when I

11  guess as defense counsel described it, he's unsure what

12  happened and there were I guess seven to eight people I

13  think as described that were fighting.

14          Your Honor, in that situation, the government

15  would proffer and certainly could prove that Mr. Gelardo

16  went to a location to confront individuals.  It wasn't an

17  act of self-defense.  It was an act of aggression and an

18  act of violence.  He went there armed and he went there

19  ready to assault other individuals which he in fact did.

20          In addition, your Honor, the other incident

21  which he essentially assaulted an individual to collect a

22  gambling debt, I don't think that saying that the

23  individual who he hit was not seriously hurt is a viable

24  defense to that conduct.  He's charged with Hobbs Act

25  extortion conspiracy for that crime.

16

Proceedings

1          And your Honor, I would like to address the

2   concerning amount of assets that the defendant has had.

3          First of all, it should really be highlighted

4   that the defendant had $208,000 in cash last week in his

5   safe.  That cannot be explained by any gainful employment

6   that sounds like at the very least ended in early 2020

7   but likely before then.  And certainly the government has

8   no proof that the defendant has had any legitimate income

9   and any gainful employment ever frankly.  And certainly

10  that's not been provided to the government and certainly

11  not for it sounds like at least five years.

12          In addition, these assets, for example,

13  payments for his $400,000 car, are made routinely and

14  those are thousands of dollars every month.  That cannot

15  be explained.  And frankly, your Honor, I think the only

16  reasonable inference at this point is that all of those

17  proceeds are criminal proceeds from extortions, from

18  loansharking, from other crimes.

19          And your Honor, I don't know if your Honor has

20  any questions about suretors or anything like that.  From

21  the government's perspective, what was recovered from his

22  premises, which is as I understand the same property that

23  he seeks to put up and have his sister sign for, we're

24  still investigating whether that is appropriate, whether

25  that is a place where crimes, you know, took place, or an

17

Proceedings

1   instrumentality of the crime.  We think that's wholly

2   inappropriate.

3           THE COURT:  Do you know how that property was

4   purchased, who owns it, Ms. Chen?

5           MS. CHEN:  We have not done a dive into that,

6   your Honor.  If obviously a bail package were to be

7   entertained, we would do a significant, you know,

8   investigation into the proposed suretors and the property

9   that they intend to put up.

10          MR. GIOFFRE:  I think --

11          THE COURT:  One other question for Ms. Chen

12   first.

13          MR. GIOFFRE:  Okay.

14          THE COURT:  The photographs that you provided,

15   I'm sure you provided a copy to Mr. Gioffre.

16          MS. CHEN:  I did, your Honor.

17          THE COURT:  Okay.  In addition to the non-

18   firearm items, there were pictures, as you noted, of

19   various jewelry items.  Do you have an understanding or

20   is the government -- have you done any investigation into

21   the provenance of these jewelry items, Ms. Chen?

22          MS. CHEN:  I'm sorry, your Honor, the what of

23   the jewelry items?

24          THE COURT:  The provenance.  Like where are

25   these jewelry items from?  They all have this like bag on

18

Proceedings

1    them from a jeweler.

2            MS. CHEN:  We have not, your Honor.  We're

3    still investigating all of what was recovered last week.

4    We're trying to assess the value of all of what was

5    recovered as well as the source.  I understand some of

6    the watches they were able to recover receipts and things

7    like that.  But to date there is not a clear

8    understanding as to how this was paid for, how it was

9    purchased, or when.

10            THE COURT:  If purchased.

11            MS. CHEN:  Correct, your Honor.

12            THE COURT:  You don't know whether it was

13    purchased?

14            MS. CHEN:  We do not.

15            THE COURT:  All right.  Mr. Gioffre, would you

16    like to respond?

17            MR. GIOFFRE:  Yes.  With respect to the source

18    of the property that we're looking to put up, I could

19    tell you that that property was a gift from his father,

20    his mom and dad, to his sister and himself years, like

21    20, 30 years ago when they first bought it.  They bought

22    both properties right near each other.  It's basically a

23    complex and they're within, you know, earshot of each

24    other almost.  They were given to both my client and his

25    sister.

19

Proceedings

1          He gave, my client transferred his ownership

2   interest in 2000 and -- I think it's -- I have it here,

3   2014.  That was way before this case ever started.  He

4   transferred that interest to his sister for no money

5   value, your Honor.  There were personal reasons why his

6   sister was entitled to that (inaudible).  So that

7   property, in my belief, that property I believe would be

8   usable for collateral in this instance.

9          With respect to the People's allegation with

10   John Doe number 5 where I've stated that it's my

11   understanding that person didn't have an injury, with

12   respect to, you know, defenses in that case, I don't

13   believe that the government would be able to, will be

14   able to establish in that case that it was -- that any

15   interaction my client had with John Doe was over a debt.

16   It had nothing to do with a debt.  The debt that my

17   understanding wasn't owed to my client, has nothing to do

18   with that.  It could have been a separate isolated

19   instance with John Doe number 5.

20          With respect to the incident that happened

21   inside of 80 Washington with other co-defendants, I would

22   just state that defendant Ziliani is also alleged to have

23   been present during that and brandished a gun in that

24   instance and he received a $500,000 I believe with

25   collateral and FRPs.

20

Proceedings

1          So we're asking this Court to basically treat

2     my client the same way in line with that particular bail

3     as well.  Thank you.

4          THE COURT:  All right.  Ms. Chen, do you see

5     any differences between this defendant and Mr. Ziliani?

6          MS. CHEN:  I see significant differences, your

7     Honor.  First of all, Mr. Ziliani had no criminal

8     history.  With respect to Mr. Gelardo, obviously your

9     Honor has the Pretrial Services report including his

10    probation violation in 2008.

11         In addition, what was found at I believe Mr.

12    Ziliani's premises that was also searched but certainly

13    it wasn't the arsenal of weapons and the number of assets

14    and the amount of cash that was found at Mr. Gelardo's

15    apartment.  Certainly that distinguishes the two.

16         Also, I do want to note for the record, your

17    Honor, that the government did seek Mr. Ziliani's

18    detention at that time and certainly the magistrate judge

19    obviously disagreed.

20         I do want to address very briefly, your Honor,

21    the John Doe 5 incident.  As set forth in the detention

22    memo pages 12 and 13, there are text communications

23    between co-defendant Zhen Hu and John Doe 5 essentially

24    describing that John Doe 5 was not paying Zhen Hu.

25    Again, the government goes on to describe what happened.

21

Proceedings

1          And then ultimately there are additional text

2    exchanges between John Doe 5 and co-defendant Zhen Hu

3    saying that John Doe 5 said, "You sent a bunch of goons

4    to solve your problems."  To say that was an isolated

5    incident I think, your Honor --

6          THE COURT:  Remind me what page this is on.  I

7    know I read that text.

8          MS. CHEN:  Sure.  That's on page 12 and 13,

9    your Honor.

10          THE COURT:  Okay.  Go ahead, Ms. Chen.

11          MS. CHEN:  I was just highlighting the last

12    text message on page 13, your Honor, in which John Doe 5

13    texts co-defendant Hue and says, "You sent a bunch of

14    goons to solve your problems," essentially referring to

15    defendant Gelardo coming and assaulting John Doe 5.

16          And so again, your Honor, I don't think defense

17    counsel's argument should be credited that it could have

18    just been an isolated unrelated incident in which he

19    assaulted John Doe 5.

20          THE COURT:  The assault --

21          MR. GIOFFRE:  (Inaudible) --

22          THE COURT:  Just one sec.  The assault

23    allegation regarding John Doe 5, what was the manner of

24    the assault, Ms. Chen?

25          MS. CHEN:  My understanding is that Mr. Gelardo

22

Proceedings

1  essentially punched him in the face, John Doe 5 in the

2  face.

3          THE COURT:  All right.  Mr. Gioffre?

4          MR. GIOFFRE:  Yes.  With respect to those text

5  messages, there's no text messages attributed coming from

6  my client, no admissions of any type of criminality.

7  This is strictly with a co-defendant and John Doe 5.

8          And my understanding too is that the text

9  message from John Doe 5 was over a year after the alleged

10 incident where it says something about goons.  But we

11 can't say what incident it was or what.  It's so

12 innocuous to be able to determine that and to attribute

13 it to my client I think it has no relevance with respect

14 to my client.  It's a self-serving statement, texts by

15 John Doe 5, but with no identification as to who did this

16 or anything.  Goons?  I mean that's a very broad term.

17         With respect to Mr. -- with defendant Ziliani,

18 your Honor, I would argue there is a lot to distinguish.

19 One thing, he's considered a member of LCN.  My client is

20 not.

21         In addition, what was found at Ziliani's

22 residence when he was arrested was a real gun, not a, you

23 know, a paintball gun.  So he's much more serious a

24 concern as far as safety of the public than my client.  I

25 understand my client's criminal record from 2009 and

23

Proceedings

1  2011.  But the point is, Judge, he's a different person

2  with respect to, you know, his son.  He's 45 years old.

3  He was 25 years old when his criminal history started.

4          So your Honor, I think $500,000 bail, even if

5  your Honor wanted to go higher on that, 750, we'd be okay

6  with that too, your Honor, under the circumstances.  But

7  to detain my client I think would be very unfair.  Thank

8  you.

9          THE COURT:  All right.  Thank you.  So I do

10  want to take a few minutes to think about this.  I do

11  think this is a very close call given the criminal

12  history here and the weight of the evidence against Mr.

13  Gelardo.  So I am going to just actually put this on for

14  second call, very first case at 2 o'clock, and I will

15  announce my decision.  All right?

16          MR. GIOFFRE:  Thank you, your Honor.

17          THE COURT:  All right.  Thank you.

18          THE CLERK:  Thank you.  Okay.  See you at 2.

19                  (Off the record)

20          THE CLERK:  Okay.  Second call, *USA v. Eric* --

21  sorry, excuse me.  Got the wrong case number.  Second

22  call on *USA v. Thomas Gelardo* for bail application, case

23  number 25-cr-314.

24          Again, appearing for the government?

25          MS. CHEN:  Good afternoon, your Honor.  Irisa

24

Proceedings

1    Chen for the government.

2              THE CLERK:  Thank you.  And for Mr. Gelardo?

3              MR. GIOFFRE:  Bruno Gioffre for Mr. Gelardo.

4    Good afternoon, your Honor.

5              THE CLERK:  Thank you.

6              THE COURT:  Good afternoon to everybody.

7              So as I indicated during the morning session I

8    did want a few minutes to reflect on the outcome of the

9    argument that we heard this morning.

10             And in a nutshell, I'm not going to bury the

11   lead, Mr. Gioffre, I am going to grant the government's

12   motion to detain Mr. Gelardo.  But I did want to make

13   some findings in support of that determination.

14             As the parties are familiar, in determining

15   whether or not to release an individual on pretrial

16   release, the Court must consider the factors set forth in

17   Section 3142(g) including the nature and circumstances of

18   the offense charged, the weight of the evidence against

19   the person, the history and characteristics of the person

20   including his character, physical and mental condition,

21   family ties, employment, financial resources, length of

22   residence in the community, community ties, past conduct,

23   history relating to drug or alcohol abuse, criminal

24   history, and record concerning appearance at court

25   proceedings, as well as the nature and seriousness of the

25

Proceedings

1  danger to any person or the community that would be posed

2  by the person's release.

3           In evaluating each of these factors as they

4  concern Mr. Gelardo, I do find that the nature and

5  circumstances of the offense charged, to start with that,

6  suggests that the crime charged here is very serious.  As

7  the parties know, Mr. Gelardo is charged with wire fraud

8  conspiracy, illegal gambling, money laundering

9  conspiracy, and Hobbs Act extortion, account that carries

10  a presumption that he will -- either a presumption of

11  risk of flight or a danger to the community or both.

12           I note that under multiple of those counts,

13  except for the illegal gambling charge, he's facing a

14  statutory maximum penalty of up to 20 years.  Is that

15  correct, Ms. Chen?

16           MS. CHEN:  That's correct, your Honor.

17           THE COURT:  In addition, I note that at the

18  morning argument Ms. Chen estimated the guidelines range

19  that could apply to this case to be well above the ten

20  year mark even with acceptance of responsibility.  She

21  estimated based on the government's current information,

22  that the defendant is facing 168 to 210 months without

23  acceptance of responsibility.  It would still be I

24  believe north of ten years if the defendant does qualify

25  for three points off for acceptance of responsibility.

26

Proceedings

1    So there's no question in the Court's mind that

2    the nature and circumstances of the crimes charged are

3    very serious.

4    In addition, the Court finds that the weight of

5    the evidence that has been proffered as to Mr. Gelardo is

6    substantial.  As it is detailed in the government's

7    detention memo, there is substantial evidence that this

8    defendant's involvement in a large complex organization

9    that was involved in repeated collections, one of which

10   was the collection at issue that led to the Hobbs Act

11   extortion conspiracy charged in Count 5.

12   So each of those factors do in my view weigh in

13   favor of detention here insofar as the defendant has

14   serious crimes charged and the weight of the evidence

15   against him is very strong.

16   The history and the characteristics of the

17   defendant are a more complicated picture.  Mr. Gioffre

18   has offered argument that some of the criminal history

19   here reflected in the Pretrial Services report reflects a

20   different man, a younger man.  And although the Court

21   recognizes that people's attitudes towards criminal

22   conduct do tend to shift over the course of a lifetime

23   and that folks in their 20s and teens are sometimes more

24   inclined towards violent crime than folks who are older,

25   Mr. Gelardo's criminal history reflects a lengthy series

27

Proceedings

1    of charges dating back to 2002 where he was first charged

2    with a violent felony offense.  Again in 2004 he was

3    charged with a violent felony offense.  I recognize that

4    some of these were pled down to lessor crimes such as the

5    2004 charge, but it is notable that these allegations

6    start at a young age and they don't stop.  And at age 34,

7    Mr. Gelardo was charged with stalking, engaging in

8    threats and terroristic threats.  And again, although

9    that was ultimately pled down to criminal trespass which

10   was an E, was it an E felony do you know, Ms. Chen?

11           MS. CHEN:  I'd have to check the Pretrial

12   report, your Honor, but I --

13           THE COURT:  It says unlicensed E.  Do you know,

14   Mr. Gioffre?

15           MR. GIOFFRE:  I was in contact with the New

16   Jersey attorney on that and I believe there was no

17   felony.  It was a misdemeanor.  And I also believe that

18   everything was dismissed.  This was actually something

19   going back and forth between the mother of his child and

20   using custody and making allegations against him.  That's

21   why mostly everything was dismissed.

22           THE COURT:  All right.  So that one is related

23   to a domestic incident and then that is somewhat less

24   powerful than if it were related to something to

25   organized crime or allegations concerning organized

Transcriptions Plus II, Inc.

28

Proceedings

1    crime.

2            But I note that at 25 he was charged in

3    Westchester County Court originally with criminal

4    possession of a weapon in the second degree.  That too

5    was alleged as a violent felony offense and ultimately

6    resulted in a class D felony conviction.

7            And then there's a series of arrests which

8    admittedly were dismissed but all related to violence-

9    related offenses in a domestic violence context which are

10   still serious.  And they do not evince a pattern whereby

11   this defendant is ceasing to engage in conduct that would

12   result in arrest as he gets older.

13           In addition, the conduct that is alleged here

14   suggests that the defendant has continued to stay

15   involved in crime.

16           And I note that during the morning conference

17   there was discussion regarding the defendant's

18   substantial unexplained assets which cause the Court

19   great concern insofar as -- okay.  Apparently my Siri

20   wants to get involved.  I'm going to shut this.  Serious

21   unexplained assets that cause the Court concern because

22   they evince again that he's continuing to lead a criminal

23   lifestyle and in fact likely does not have income outside

24   of criminal activity.

25           I note that the government mentioned seizing

29

Proceedings

1   $500,000 in a bank account held by Mr. Gelardo, $220,000

2   in cash seized from his home, $1,600 in cash seized from

3   his wallet.  He also apparently has a vehicle valued at

4   $400,000.  And all of this totality of the circumstances

5   suggest that Mr. Gelardo has continued to engage in

6   criminal conduct and that he has done so through an

7   organized group that was earning tremendous amounts of

8   money in operating these various gambling operations.

9           So I really thought hard over the lunch as to

10  whether or not I could fashion release conditions that

11  would be adequate to protect the community from future

12  crime by Mr. Gelardo.  And I was reminded of the

13  teachings of the Second Circuit in the *Arena* case which

14  made clear as early as 1993 in this circuit that as a

15  general matter, for this I'm quoting from *United States*

16  *v. Dono*, F.App'x 35 (2008).  They're discussing the *Arena*

17  case.

18          "As a general matter, we have noted that the

19  idea that specified conditions of bail protect the public

20  more than detention is flawed because, among other

21  reasons," and this is a quote from *Arena*, "these

22  conditions would at best elaborately replicate a

23  detention facility without the confidence of security

24  such a facility instills."

25          Although I have no doubt about the bona fides

30

Proceedings

1   of Mr. Gelardo's proferred sureties and I have no doubt

2   about the sincerity of their views that Mr. Gelardo would

3   attempt to abide by the conditions of release, there's no

4   bail package that I could fashion in this case that

5   wouldn't elaborately replicate a detention facility and

6   that is disfavored in this circuit.  I do not trust that

7   Mr. Gelardo is going to abide by the conditions of

8   release given his prior criminal conduct while on

9   probation.  I do not trust that Mr. Gelardo is going to

10  not engage in any criminal conduct.

11          And the context of the criminal conduct in this

12  case is important.  Mr. Gelardo, as has been made clear

13  in the indictment and the detention memo, is charged in a

14  scheme involving members and associates of organized

15  crime.  And although Mr. Gelardo himself is not alleged

16  to be a made member of organized crime, when folks are

17  involved in organized criminal conduct of this type, it

18  is frequently the case that they and their compatriots

19  pose a risk of dangerousness to the community.

20          And here, in addition to the normal factors

21  under 3142, I have to consider the additional weight that

22  the presumption of dangerousness brings to the equation.

23  Of course the burden of proving the defendant's

24  dangerousness by clear and convincing evidence remains

25  with the government at all times.  But the Court still

31

Proceedings

1    must factor in that presumption in my analysis.

2            And for that proposition I cite *United States*

3    *v. Mattis*, 963 F.3d, 285, 290-291 where the Second

4    Circuit observed that this presumption, meaning the

5    presumption of dangerousness, may be rebutted by the

6    defendant who "bears a limited burden of production by

7    coming forward with evidence that he does not pose a

8    danger to the community."  And that is the *Mattis* case

9    citing *United States v. Mercedes*, 254 F.3d 433, 436 (2d

10   Cir. 2001).

11           And then they resume quoting the *Mercedes* case.

12   Once a defendant has met his burden of production, the

13   presumption favoring detention does not disappear

14   entirely but remains a factor to be considered among

15   those weighted by the district court.  Even in a

16   presumption case, the government retains the ultimate

17   burden of persuasion by clear and convincing evidence

18   that the defendant presents a danger to the community.

19           Although I do find that the defendant's bail

20   package makes progress towards rebutting the presumption,

21   it ultimately does not overcome that presumption when

22   weighed against all of the other factors that I must

23   consider under 3142(g).

24           In a nutshell, I find that Mr. Gelardo's lack

25   of gainful employment, lack of explained resources

32

Proceedings

1    suggest that he has been involved in a criminal lifestyle

2    earning tremendous sums of money over the past five years

3    if not stretching further into the past together with

4    others involved in organized crime and the totality of

5    the circumstances before me with the proffered bail

6    package as offered today, Mr. Gioffre, the application

7    for bail is denied.

8              Is there anything else to do today, Ms. Chen?

9              MS. CHEN:  Not from the government, your Honor.

10   Thank you.

11             THE COURT:  Mr. Gioffre?

12             MR. GIOFFRE:  Only, your Honor, I respect your

13   decision.  Wondering if the home detention monitor would

14   be something your Honor would consider.

15             THE COURT:  That's one of the things I

16   considered over the lunch break and that is exactly the

17   concern that is raised in the *Arena* case and the *Milan*

18   case, *LaFontaine* case, case after case after case where

19   individuals who are charged with organized orchestrated

20   violence are deemed to pose a danger to the community and

21   have a presumption under the statute that they do pose

22   such a danger.  Trying to reconstruct a jail facility for

23   those persons in their homes is not appropriate.  And I

24   wouldn't consider releasing Mr. Gelardo on the basis of

25   the current record without home incarceration, and that

33

Proceedings

1   is not appropriate.  Not appropriate.  He poses too great

2   of a danger.  And frankly has not proffered sufficient

3   evidence to rebut the government's proffer of the

4   evidence and the presumption that applies here.  I just

5   don't find that Mr. Gelardo has provided much information

6   for the Court to really understand who he is, what he's

7   been doing, and that he will not engage in crime while on

8   pretrial release.

9           MR. GIOFFRE:  Thank you.

10          THE CLERK:  Thank you.

11                  (Matter concluded)

12                      -oOo-

13

14

15

16

17

18

19

20

21

22

23

24

25

34

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **1st** day of **November**, 2025.

*Mary Greco*

Transcriptions Plus II, Inc.