1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2      - - - - - - - - - - - - - X
                                 :
3      UNITED STATES OF AMERICA,  :   25-CR-314(RER)
                                 :
4                                 :
           -against-             :   United States Courthouse
5                                 :   Brooklyn, New York
                                 :
6      THOMAS GELARDO,           :
                                 :   November 19, 2025
7              Defendant.        :   10:00 a.m.
                                 :
8      - - - - - - - - - - - - - X

9      _____

10         TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPLICATION
             BEFORE THE HONORABLE RAMON E. REYES
11                UNITED STATES DISTRICT JUDGE
       _____

12

                   A P P E A R A N C E S:
13

       For the Government:  JOSEPH NOCELLA, JR.
14                          United States Attorney
                            Eastern District of New York
15                          271-A Cadman Plaza East
                            Brooklyn, New York 11201
16                          BY: IRISA CHEN, ESQ.
                              MICHAEL GIBALDI, ESQ.
17                            SEAN SHERMAN, ESQ.
                              Assistant United States Attorneys
18
       For the Defendant:   LAW OFFICE OF BRUNO V. GIOFFRE, JR., PLLC
19                          111 South Ridge Street, Suite 303
                            Rye Brook, New York 10573
20                          BY: BRUNO V. GIOFFRE, JR., ESQ.

21
       REPORTED BY:
22     Kristi Cruz, RMR, CRR, RPR
       Official Court Reporter
23     kristi.edny@gmail.com

24     Proceedings recorded by computerized stenography.  Transcript produced by
       Computer-Aided Transcription.

25                 *       *       *       *       *

PROCEEDINGS                                                    2

1              (In open court.)

2              THE COURTROOM DEPUTY:  Criminal cause for a bond

3    application in *USA v. Aiello*, docket number 25-CR-314.

4              Counsel for the Government, please state your name

5    for the record.

6              MS. CHEN:  Good morning, Your Honor.

7              Irisa Chen, Michael Gibaldi, and Sean Sherman for

8    the Government.

9              THE COURT:  Good morning.

10             THE COURTROOM DEPUTY:  Counsel for the defendant,

11   please state your fame for the record.

12             MR. GIOFFRE:  Yes, Good morning, Your Honor.

13             Bruno Gioffre for Mr. Gelardo.

14             THE COURT:  Good morning.

15             Good morning, Mr. Gelardo.

16             THE DEFENDANT:  Good morning.

17             THE COURT:  Mr. Gioffre, this is your application.

18   Go ahead.

19             MR. GIOFFRE:  Yes, Your Honor.

20             First thing I'd like to point out, this goes to

21   the support that my client has.  You can see in the

22   courtroom my client has several friends, family.  His

23   sister's here, his employer is here who, if he's released,

24   he'd be working for.  There's three other sureties that

25   could be available by phone if you need to interview them.

PROCEEDINGS                                    3

1   One is in Clemsen picking up his daughter at college.

2   Another one is in Florida.  Another one couldn't get off of

3   work; he's in Greenberg.

4           That being said, Your Honor -- also, just for the

5   record, my client's -- the mother of his child, Victoria

6   Bruce, is on her way, she should be here within minutes.

7   She hit a lot of traffic coming from Long Island after

8   dropping off her son to school, which is why she's a little

9   bit delayed.  Obviously the importance for my client's

10  release is also connected to his son, support for his son.

11  Not just financial support; emotional support.  He also

12  suffers, his son, from a great deal of anxiety.  So that's

13  another reason why he's desperate to get home, to help care

14  for his son.

15          That being said, Your Honor, based upon everything

16  that we've put forth --

17          THE COURT:  He doesn't live with his son, right?

18          MR. GIOFFRE:  What's that?

19          THE COURT:  He doesn't live with his son?

20          MR. GIOFFRE:  He has shared custody.  Primary with

21  the mom, but he has him every other weekend, and twice

22  during the week he sees him.  But he does have his son every

23  other weekend, overnights.

24          Based on everything that's put forth in my

25  application, Your Honor, especially the fact that we have 30

PROCEEDINGS                                    4

1    other defendants -- or 29 other defendants that have been

2    released under this case, the people haven't demonstrated

3    detention to establish dangerousness or intimidation --

4              THE COURT:  He's charged with a crime of violence,

5    correct?

6              MR. GIOFFRE:  Yes, Your Honor.  But if we look at

7    that isolated crime that he's charged with, I believe the

8    evidence in that case, which I put forth in my papers, shows

9    very, very slim connection with my client with that

10   particular person and no evidence of an extortion at all.

11   Just the mere fact that that person owed someone else in

12   this case money who they have evidence of doesn't establish

13   any type of connection with an extortion with my client.

14             THE COURT:  It's wholly circumstantial, correct?

15             MR. GIOFFRE:  Correct.  If you look at even John

16   Doe's texts, it doesn't mention my client, doesn't specify

17   my client, doesn't describe my client, doesn't say when it

18   happened, doesn't say anything.

19             THE COURT:  No obligation from the Government to

20   put all its cards on the table at this point, correct?

21             MR. GIOFFRE:  True.  But even when it was put

22   forth by Judge Merkl, they had no response to that.  They

23   could not establish any connection from my client, any

24   admissions, anything that my client was connected to the

25   overall conspiracy.

PROCEEDINGS                                                5

1        In addition, Judge, I think it's very important, I

2   know the people highlighted it last night in their

3   submission, that was 10:30 at night last night when it's

4   been a week and a half since my submission, they throw that

5   in there, and there's things in that submission that they

6   provided you last night that I believe are disingenuous.

7        Number one, they're talking about things that were

8   recovered from my client's residence.  They are purporting

9   that they are illegal handguns.  These are paintball guns.

10  There's no ballistics.  You can see the gun that they're

11  referring to, calling it possibly a Glock, if you look at

12  the picture, you could see that there's rubber bullets in

13  the --

14        THE COURT:  You're not arguing that rubber bullets

15  aren't dangerous, are you, counselor?

16        MR. GIOFFRE:  I'm arguing that it's not illegal.

17  It's not illegal to have a self defense rubber bullet type

18  of gun.  You can buy it online.

19        THE COURT:  He's not being charged with possession

20  of illegal weapons.

21        MR. GIOFFRE:  No, he's not, but they're trying to

22  say that that shows violence and propensity.  That's what

23  they're trying to argue with their paper.  My point is --

24        THE COURT:  Rubber bullets propelled from a

25  handgun, even if it's with $CO_2$, is dangerous.

PROCEEDINGS                                    6

1          MR. GIOFFRE:  I --

2          THE COURT:  I mean, you could look on the news to

3    see all the people who have been maimed by rubber bullets.

4          MR. GIOFFRE:  I get that, Your Honor.  But my

5    position is that actually shows restraint in some regard

6    because he doesn't have an illegal handgun.  I put on the

7    record, I'm sure you read my current script with Judge

8    Merkl, my client was approached by the FBI over six months

9    ago.  I know this because he came and spoke to me about

10   this, and was approached and was advised that his life was

11   in danger by, you know, people in the underground world,

12   we'll put it that way.  And at the end of the day, he didn't

13   go out and get a handgun, a real gun.  He had something that

14   he could protect himself just in case.  Same thing with

15   the -- by the way, the ballistics vests, one of them, yes,

16   ballistics vest to protect himself.

17          THE COURT:  Live guns of whatever nature are --

18          MR. GIOFFRE:  Paintball guns, Judge.

19          THE COURT:  Capable of shooting rubber bullets,

20   perhaps.

21          MR. GIOFFRE:  Only one had the rubber bullets,

22   Judge.

23          THE COURT:  Brass knuckles, I see three, although

24   it's not clear if it's two or three.  Numerous knives.

25          MR. GIOFFRE:  Collectibles.  Collectibles, Judge.

PROCEEDINGS                    7

1          THE COURT:  Dangerous yet.

2          MR. GIOFFRE:  Collectible.  Not illegal to

3    possession in your home, Judge.

4          THE COURT:  Dangerousness is not judged -- a

5    machete -- dangerousness is not judged by the illegality of

6    the weapons.

7          MR. GIOFFRE:  I understand.  But anything could be

8    dangerous, Your Honor.  A pen can be dangerous, if we're

9    going to go down that route.  And the other guns were not

10   rubber bullets.  They were all pellet guns for paintball.

11   Paintball pellets.  He's an avid paintball, you know,

12   athlete.  He does it, takes his son to things like that.

13   It's paintball.  It's fun.  Nothing about that.  They laid

14   it out on the bed looking like they're real guns.  It's been

15   a month and they haven't done ballistics on those guns?

16   They're making a representation almost like they're real

17   guns?  They're not real guns, Judge.  And one of the

18   ballistics vests, by the way, was a Halloween costume.  It's

19   not a ballistics vest.  It's a Halloween costume.  The

20   camouflage one.

21          That being said, Your Honor, I believe the

22   defendant's -- oh, one other thing about their submission,

23   my apologies.

24          With respect to the amount of money that was

25   seized and the jewelry, I verified through relatives that

PROCEEDINGS                          8

1    most of that jewelry, if not all of that jewelry, was bought

2    more than ten years ago or gifts more than ten years ago

3    from other relatives to my client.  There's nothing in this

4    case that establishes that any of those funds or any of the

5    jewelry or anything was derived specifically from this case.

6    In fact, the bank account that was seized, we have -- we

7    would be able to establish proof that the monies were there

8    way before this alleged conspiracy even happened and was

9    accumulated over a long period of time by legitimate means.

10         So, Your Honor, it's my client's -- it's in his

11   best interest to appear in court, not to flee, to cooperate,

12   to cooperate with all conditions.  Those conditions could

13   be, if Your Honor is so inclined, ankle bracelet, curfew,

14   anything that you want.  It's not going to be -- we

15   understand it's not incarceration, but home detention he'd

16   be willing to do, and I think could handle the

17   dangerousness.

18         And as far as risk of flight, Judge, it's in his

19   interest to stay here and fight these charges, what we

20   believe we could fight, because what was forfeited and what

21   they've seized, it's in his interest to try to fight this

22   and to get that back because he knows that they were legit,

23   and he is here with counsel and intends to do that.

24         So, Your Honor, I think there's several conditions

25   that could assure Your Honor and address dangerousness.

PROCEEDINGS                                              9

1   There's no evidence of tampering with any witnesses.  The

2   only person that's in right now is Mr. Ruggiero, and we

3   understand the position of the Court with someone who has,

4   you know, actually been convicted of intimidating witnesses

5   and things like that.  We don't have that here, Your Honor.

6               THE COURT:  I think it's actually Ruggiero.  I got

7   that wrong too.

8               MR. GIOFFRE:  I'm Italian, too, and I couldn't say

9   it.  Sorry, Judge.

10              So that's the basis of everything.  I'm happy to

11  answer any additional questions, Judge.

12              THE COURT:  I mean, the caselaw's pretty clear

13  that elaborate conditions in a case involving dangerousness

14  are inadequate to protect the community and witnesses,

15  et cetera.  I'm just struggling with how to overcome that,

16  especially since Mr. Gelardo is asking to not have his

17  liberty completely curtailed.  If he's released on a bond

18  that lets him go about his business working for his

19  prospective employer, there's very little, very, very little

20  that the Government could do to prevent him from being a

21  danger.

22              MR. GIOFFRE:  Well, I mean, if he has a -- if he

23  has an ankle bracelet and he's only allowed to go to work

24  and home and see his son and things like that --

25              THE COURT:  That's all after the fact, right?

PROCEEDINGS                                    10

1   There's no way to monitor that in an effective way absent

2   putting a 24/7 tag on him.

3           MR. GIOFFRE:  Which they have been known to do.

4   I'm not saying that they are required to do that, no.  But,

5   Judge, also there's no allegation in this case that I'm

6   aware of that my client has any -- or has had any further

7   dealings with John Doe #5 prior or after the alleged

8   incident that they're claiming happened, even if it, you

9   know, did happen, if you take their word for it, John Doe's

10  word that it happened of an assault.  There's been no

11  further threats.  There's no connection.  There's no text

12  messages between him and John Doe #5.  There's no phone

13  calls after the fact, nothing.

14          So I don't think the Court -- in my opinion, I

15  think you can feel confident that there's not going to be

16  any outreach to witnesses or things like that in this case.

17  My client lives in Westchester County.  His sister is here.

18  By the way, his mom and dad wanted to be down here, but his

19  mom suffers from MS; she's just not well enough.

20          THE COURT:  They live in the --

21          MR. GIOFFRE:  In the same condo complex.  So it's

22  very important that he could be there.  They're not next

23  door, but building to building, right there.  He would be

24  isolated in that particular area for the most part, other

25  than when he's working.

1          The risk of intimidating witnesses and things like

2    that I don't think is there, Judge.  I really think you

3    could feel confident that that's not going to -- that's not

4    going to happen.

5          THE COURT:  Ms. Chen?

6          MS. CHEN:  Thank you, Your Honor.

7          I don't want to reiterate everything that Your

8    Honor has read that was discussed before Judge Merkl or

9    that's in the parties' submissions, but I do want to address

10   a couple of things.

11         I'll start first with risk of flight which, as

12   Your Honor is aware, the Government only needs to prove by a

13   preponderance.  Here the defendant is facing, based on the

14   charges, a preliminary guidelines estimate of 168 to 210

15   months of incarceration.  This is certainly a term of

16   incarceration significantly greater than any term of

17   incarceration the defendant has ever served before despite

18   his significant criminal history dating back to 2002,

19   including, as noted in the pretrial report, numerous violent

20   felony offenses including assault in the second degree, as

21   well as criminal possession of a firearm.

22         In addition, I think I stated in the Government's

23   bail letter and detention letter, the evidence here is

24   strong, contrary to what counsel states, both with respect

25   to the crime of violence which was discussed, the

PROCEEDINGS                                    12

1    defendant's specific assault of the victim, where he

2    physically punched the victim.  And I understand that

3    certainly there will be testimony about it and certainly

4    there are text messages as well concerning that particular

5    incident --

6              THE COURT:  Do I even need to find, I guess, that

7    he was the one who punched him?  Isn't being involved in an

8    extortion where a group of people confront someone that

9    allegedly owes money and someone uses violence in that,

10   isn't that enough?

11             MS. CHEN:  Absolutely, Your Honor.  As stated in

12   the Government's letter, Hobbs Act extortion conspiracy

13   itself is a crime of violence.  And so you're right that

14   Mr. Gelardo's specific, you know, involvement in assaulting

15   the victim himself is not even necessary for the Court to

16   find at this point, but the Government would just proffer so

17   just to explain the extent of the defendant's involvement

18   here.

19             I think further, though, it's important to give

20   the Court a little context of this particular defendant's

21   role in this scheme.

22             As laid out, I think, in the indictment and the

23   detention memo, this defendant was essentially an enforcer

24   for the collection of debts and the muscle behind the

25   gambling schemes laid out here.  He was paid, essentially, a

PROCEEDINGS                    13

1    tribute for backing the games and acting in this capacity of

2    enforcing the debts, and that in particular highlights his

3    role of being particularly violent and being a danger to the

4    community.  And again, I say this all just to highlight a

5    portion of the strength of the evidence in this case as it

6    goes to risk of flight.

7              Another concern, and I think this is evident from

8    both the pretrial report and the Government's papers, is the

9    defendant's hidden assets, I'll say, or refusal to be

10   forthcoming about his total financial picture.  As noted in

11   the pretrial report, the defendant refused to disclose a

12   fulsome account of his bank accounts and his financial

13   picture.  As is evident from the search warrant executions

14   and the seizure executions, the defendant has significant

15   assets, including over $200,000 in cash that was found at

16   his house.  So clearly, what other assets the defendant has

17   that could be used to flee prosecution in this case.

18             I also want to highlight, of course, the danger to

19   the community which the Government's discussed at length

20   and, frankly, we think is quite evident from the arsenal of

21   weapons that were found at his residence.  It is extremely

22   concerning that we are learning that his son also spends

23   time there with multiple knives, as Your Honor has seen and

24   the Government submitted, brass knuckles, the extendible

25   baton, which we understand is extendible because it is

1    concealable more easily that way.  I know counsel takes

2    issue with the Government's description of the pistols.  I

3    believe we described them as air pistols consistent with

4    what they are, and I will not describe them.  Your Honor has

5    the pictures.  They appear very real and they certainly, as

6    Your Honor has already highlighted, are dangerous, even if

7    not technically illegal, because the defendant is a prior

8    felon.

9            I just want to highlight certain of what counsel

10   stated in his letter regarding alleged legitimate

11   employment.  So, first of all, with respect to the bank

12   account, the bank account was seized pursuant to a seizure

13   warrant.  It was not seized as part of any search warrant or

14   anything other than a seizure warrant, which essentially

15   finds that there was probable cause that the assets in there

16   were forfeitable as laundered proceeds from the scheme

17   that's charged.  I understand defendant will contest that,

18   but, frankly, some of the representations made even in court

19   today are contrary to financial records that we have.

20           I believe counsel stated that the monies were

21   traceable to proceeds from well before the scheme.  It's our

22   understanding based on financial records that the bank

23   account that was seized was opened during the middle of the

24   conspiracy; in other words, after 2019 and Count One was

25   charged.  And surely there were proceeds traced from

1    payments made by codefendant Zhen Hu to Mr. Gelardo in

2    connection with his backing of the gambling games.  Those

3    were all traced, those specific bank accounts, and that's

4    why they were seized as forfeitable property, as well as the

5    Lamborghini that the Government noted in its letter.

6              I'll also say while the defendant now claims he

7    has had legitimate income in the past, we did a little

8    digging and, from my understanding, Mr. Gelardo's last W-2

9    that was filed in New York was from 2015.  He's filed for

10   unemployment insurance benefits during COVID, as well as in

11   2002, 2003, 2004, 2006, 2007, and 2012.  This all goes,

12   again, to Mr. Gelardo's unexplained wealth, which, as the

13   Government noted and Judge Merkl found, really leads to only

14   one logical conclusion, which is that Mr. Gelardo is making

15   his money from criminal proceeds consistent with the

16   extortion, consistent with his backing of the gambling

17   scheme that's charged in this case.

18             I also note, again, this is part of what concerns

19   the Government, that the defendant himself reported that he

20   has been unemployed to Pretrial Services since 2023, and he

21   also reported that he has no monthly income.  At the time

22   that he was arrested, over 700,000 worth of assets were

23   seized from the defendant.  Again, this is entirely

24   inconsistent with someone filing for unemployment benefits

25   and someone who is stating he's unemployed with no monthly

PROCEEDINGS                              16

1    income.

2           THE COURT:  Let's assume that I find that the

3    Government has satisfied its burden on risk of flight,

4    danger to the community, even obstruction.  Are there no

5    conditions or combinations of conditions that can guard

6    against all of those risks?

7           MS. CHEN:  That is the Government's position, Your

8    Honor.  And as Judge Merkl noted in her decision and as Your

9    Honor just noted, the caselaw is quite clear that it is not

10   appropriate at this stage for the Court to craft home

11   incarceration conditions to mimic that of a prison when

12   detention is appropriate.

13          THE COURT:  Judge Merkl also said this was a close

14   case, and the proposed conditions that are before me are

15   substantially different, I believe, than in front of her, if

16   I'm not mistaken.

17          MS. CHEN:  I think the dollar amount is, Your

18   Honor.  I'm not sure if the conditions themselves are.

19          THE COURT:  Well, you can say the dollar amount is

20   a condition.

21          MS. CHEN:  Sure.

22          THE COURT:  I believe there's -- Mr. Gioffre will

23   correct me if I'm wrong, but I think there's more property

24   that's been put up.

25          MS. CHEN:  I think that's right in terms of

PROCEEDINGS                          17

 1  property, and I think number of sureties as well, Your

 2  Honor.

 3          THE COURT:  And not that I'm looking at her

 4  decision, because this is a de novo review, but perhaps that

 5  will have changed her mind and taken it from a close case to

 6  just over the line?

 7          MS. CHEN:  Your Honor, I think in the Government's

 8  view, that's probably not the case.  I think Your Honor

 9  highlighted the issue earlier in this proceeding, which is

10  that the Government cannot ensure, given everything in front

11  of the Court, that this defendant would not continue to

12  gather weapons, to commit crimes, to engage in extortion, to

13  speak or meet with co-conspirators, codefendants, and

14  witnesses in this case.  I think essentially what the

15  conditions would be would still have to be essentially

16  creating Mr. Gelardo's residence into what would be a

17  makeshift incarceratory facility, but simply in Westchester.

18          And I understand that Mr. Gioffre has pointed to

19  familial support and those who he believes would have moral

20  suasion.  But unfortunately, frankly, we see this too often

21  where those individuals also had more suasion during the

22  pendency of all of the crimes that are charged, that

23  Mr. Gelardo committed while living with his sister, in the

24  close vicinity of his parents, and certainly they were

25  unable -- either didn't know or were unable to stop it.

PROCEEDINGS                    18

1           Your Honor, I think the caselaw is clear, and

2    Judge Merkl highlighted this, it's not appropriate to

3    attempt to craft conditions that would essentially create

4    Mr. Gelardo's residence into what would be a makeshift

5    prison.

6               THE COURT:  Anything else?

7               MS. CHEN:  Nothing further, Your Honor.

8               THE COURT:  Mr. Gioffre?

9               MR. GIOFFRE:  May I?

10              THE COURT:  Yes, of course.

11              MR. GIOFFRE:  Thank you.  Appreciate it.

12              When I did go for -- I know it is de novo, but

13   when I did go for the bail application before Judge Merkl,

14   we put forth $500,000 as a bond approval based on the fact

15   that there were similarly-situated defendants at that time,

16   that that was the highest -- one of the highest bails.

17   Lanni as well as Ziliani, they were both released on

18   500,000.  And Judge Merkl is the one that released Lanni, I

19   believe, on 500,000, who had substantially more violence,

20   you know, made member, alleged made member.  So 500,000 we

21   thought at the time was appropriate.  Now I believe, you

22   know, had I known where we were going to go with that, I

23   would have had more time to put together more properties,

24   which we have three, more co-signers, which we have five

25   now.

1          I think the moral suasion here is substantial.

2     Risk of flight is not even, I think, something to consider

3     here, Judge, based upon all that.  I understand the

4     Government's position and Judge Merkl's position about not

5     creating a, you know, a jail within your home, so to speak,

6     but this wouldn't necessarily be that.  If my client's

7     allowed to, even on an ankle bracelet, allowed to go to work

8     at his employer so he could support his son and could

9     support his family, I think that's a different situation

10    here.  I think that's something that, you know, the Court

11    could find in this case a palpable resolution to ensure --

12         By the way, Judge, he understands if Your Honor

13    gives him this opportunity and if he violates any of the

14    conditions -- I know Judge Merkl was concerned about

15    employment.  The Government has mentioned that he stated to

16    Pretrial he wasn't employed.  No, he said to them he didn't

17    have full-time employment.  He never said he wasn't

18    employed, period.  His income was sporadic; I give you that.

19    He's worked for unions since he was 17 years old.  Yes,

20    there were times when there were slowdowns and he would

21    collect unemployment.

22         Judge, I personally have known this defendant

23    since he's 20 years old, and I know that he was working hard

24    at the unions.  I've talked to his father about it.  It

25    wasn't a situation where he had, you know, a no-show job or

PROCEEDINGS                                    20

1    anything like that.  He was down there working.  Were there

2    times when they were slow and he collected unemployment?

3    Absolutely.

4            But with respect to Judge Merkl, she was concerned

5    about, well, I'm worried that he's going to have no means to

6    make any money legitimately if he gets out and that's going

7    to be a violation of conditions of his bail.  I can tell

8    you, Judge, he understands and will understand fully all the

9    conditions set and he's going to abide by everything,

10   because he knows if he violates any of those conditions,

11   there is no way he's going to get bail again.  He's going in

12   and he's going to remain in until this case is resolved.

13           I believe if given the chance, Your Honor, you can

14   feel confident he's not going to violate any conditions.

15   His concern right now is his son.  That's his main concern.

16   I've spoken to him on the phone.  He's a broken man right

17   now because of his son.  And I could tell you, that's going

18   to be the biggest incentive not to violate any conditions.

19   He has a nine-year-old son that he's very close with.  I put

20   in my submission, he's at every single parent conference,

21   he's at every -- he's a sponsor on the trips.  You know,

22   he's a chaperon on school trips, everything.  This man, I

23   can assure you you're not going to have any issues if he's

24   released on whatever conditions you set.

25           Thank you, Your Honor.

PROCEEDINGS                                      21

1              MS. CHEN:  Your Honor, if I may.

2              THE COURT:  Yes.

3              MS. CHEN:  Just briefly.

4          I know a lot of the defendants have been comparing

5    themselves to one another.  As the Court knows, bail

6    decisions are individualistic based on each defendant's

7    characteristics.  There was a comparison to Mr. Lanni.

8    Mr. Lanni does not have the violent criminal history that

9    Mr. Gelardo has.  Mr. Lanni also has a significant second

10   bond in the Eastern District of New York which counsel

11   failed to mention.  But all of that is beside the point.

12             As Judge Merkl found when she said it was a close

13   call, she ultimately found that there were no conditions

14   that could assure the safety of the community and that the

15   defendant would return to court.  She did not say, as judges

16   can, that there are certain conditions that could be

17   appropriate for the defendant to be released and ask for

18   counsel to come back with an additional package.  She found

19   that there were no conditions that were appropriate for the

20   defendant's release, and that's consistent, obviously, with

21   what we've been discussing regarding a private prison.

22             And again, Your Honor, I know there are

23   representations that Judge Merkl was concerned he would not

24   have gainful employment when he's released.  I think that's

25   not a hundred percent true.  Judge Merkl's concern was that

PROCEEDINGS                    22

1   Mr. Gelardo already had a significant amount of unexplained

2   wealth given no legitimate employment history and that the

3   only conclusion that could be drawn is that the defendant

4   was engaged in significant criminal activity that has

5   essentially funded his life and led to the cash assets, the

6   bank accounts, the luxury watches, and the jewelry that was

7   seized at his apartment.

8              So it's not, essentially, the main concern of

9   Judge Merkl that should the defendant get out, he wouldn't

10  have anything to do.  It's the fact that he had already been

11  engaging in significant criminal activity that led to a

12  significant, you know, accumulation of assets.  Which,

13  frankly, as discussed in the Government's letter and with

14  Pretrial, there's still not a clear picture as to what this

15  defendant's assets are in terms of his cash, other bank

16  accounts, and what he may have access to if released.

17             Unless Your Honor has any more questions, I think

18  that is it for the Government.

19             MR. GIOFFRE:  Judge, I'd be remiss if I didn't

20  mention that my client's -- the mother of my client's child,

21  Victoria Bruce, she did come to court, she made it here.

22  She's here to support --

23             THE COURT:  I didn't know who she was, but I saw

24  her come in the door.

25             MR. GIOFFRE:  Thank you.

PROCEEDINGS                    23

1    THE COURT:  I agree with Judge Merkl that this is

2    a close case, but I'm not going to go through the 3142

3    analysis in any great detail.

4         I will say that the Government has satisfied its

5    burden to prove all the different levels that Mr. Gelardo is

6    a risk of flight and a danger to the community and that he

7    is a risk of obstructing justice.  He's been charged with a

8    crime of violence, and I do not believe that there are

9    any -- well, before that, the Government's case is strong,

10   even if somewhat circumstantial.  At bottom, I don't believe

11   that there are there any conditions or combinations of

12   conditions that can satisfy or protect against risk of

13   flight, the danger to the community, and obstruction.

14        I go back to Mr. Gelardo's history and the items

15   that were seized at the house.  I disagree completely with

16   the characterization of them as merely collectors items and

17   legal sports weapons.  They're weapons; full stop, end of

18   sentence.  Whether they're legal or not has absolutely

19   nothing to do with whether there is a danger to the

20   community.  And there is nothing, there is nothing we can do

21   short of creating or recreating the prison in Mr. Gelardo's

22   apartment.  Ankle monitor, Pretrial Services supervision,

23   it's not enough.  We would have to lock him up 24/7 in the

24   apartment, and that's what prisons are for.

25        So I'm going to deny the request for bond.

PROCEEDINGS                    24

1          Ms. Chen, I understand that -- I think it's

2     Mr. Evans that was --

3          MS. CHEN:  Ernest, Your Honor.

4          THE COURT:  Ernest, I'm sorry.  If he can appear

5     before the duty Magistrate Judge to be arraigned before --

6          MS. CHEN:  On Monday, Your Honor?

7          THE COURT:  Before Monday, I would prefer that.

8          MS. CHEN:  Well, we'll try and arrange that

9     with defense.

10         THE COURT:  He's at MDC?

11         MS. CHEN:  That's correct, Your Honor.  It's

12    defense counsel's availability that was causing issues with

13    the schedule, but we can try to work it out.

14         THE COURT:  My preference is not to have him --

15    we're already doing Mr. Billups on the 24th, who has been

16    released, and it would just create another thing to do on

17    the 24th and we've got plenty to talk about already.  If it

18    can't be arranged, then we'll do it on the 24th.  And I

19    think we're going to do it everybody together.  We're not

20    going to stage it, at least the first status conference.

21         But you need to start conferring with defense

22    counsel on how we go forward certainly with respect to

23    status conferences, because having 31 people plus counsel

24    appear is difficult logistically.  So start those

25    conversations and we'll talk about it on the 24th.

PROCEEDINGS                          25

1          MS. CHEN:  Thank you, Your Honor.

2          THE COURT:  We're adjourned.

3          MS. CHEN:  Thank you.

4          MR. GIOFFRE:  Have a good day.

5          (Matter adjourned.)

6

7                          *   *   *

8

9                CERTIFICATE OF REPORTER

10

11  I certify that the foregoing is a correct transcript of the

    record of proceedings in the above-entitled matter.

12

13

     /s/ Kristi Cruz
14  _____

    Kristi Cruz RMR, CRR, RPR
15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25